UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARLENE RYBKA,
          Plaintiff,
vs.                              CIVIL NO. 2:07-CV-11132
                                   DISTRICT JUDGE SEAN F. COX
                                 MAG. JUDGE. STEVEN D. PEPE.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
          Defendant.
_____/

### REPORT AND RECOMMENDATION

### I.    BACKGROUND

Darlene S. Rybka brought this action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision that Plaintiff was entitled to Disability Insurance Benefits (DIB)

under Title II of the Social Security Act as of April 15, 2001.  Both parties have filed motions

for Summary Judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and

(C).  For the following reasons, it is **RECOMMENDED** that Plaintiff's Motion for Summary

Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.

#### A.    Procedural History

On October 6, 2003, Plaintiff applied for DIB alleging disability since April 15, 2001,

based on ailments including cervical disc disease at C4-C5, C5-C6, and C6-C7; cervical

radiculpathy; thoracic outlet syndrome; right acromioclavicular joint arthritis; degenerative disc

disease at L5-S1; carpal tunnel syndrome; hypothyroidism; and depression R.. 51, 131).[1]  After

_____

[1] Plaintiff specified these ailments as the basis for her DIB claim in her motion for
summary judgment (Dkt. #9, p. 3). Plaintiff's Disability Report-Appeal indicates that since here
initial Disability Report she was diagnosed with fibromyalgia, bulging d9osc in C 6-7, and nerve
damage in R 1-4. (R. 81).   There does not appear to be an initial Disability Report in the record.
The record does not show any prior applications for disability although July Machm, M.D. notes

1

Plaintiff's claim was denied upon initial review on April 22, 2004 R.. 41-45), a video conference administrative hearing was held on December 16, 2005, before Administrative Law Judge (ALJ) Michael Haubner, at which Plaintiff was represented by her current attorney, Michelle Sullivan (R. 747). Vocational Expert (VE) Harry Cynowa[2] also testified. On February 9, 2006, ALJ Haubner decided Plaintiff was not disabled on or before March 31, 2003, because despite her impairments, she could perform a limited but significant number of sedentary-level jobs identified by the vocational expert Cynowa (R. 28). This became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review (R. 6-9).

## B. Background Facts

### 1. Plaintiff's Testimony and Statements

Plaintiff was 46 years old at the time of her April 15, 2001, alleged onset of disability (R. 51, 754). Her last date of insured status was March 31, 2003 (R. 59).. Plaintiff has a high school education and an associate's degree in accounting from the University of Toledo (R. 754) with work experience in the field as an accounting clerk (R. 63-66). Plaintiff testified that she was no longer able to work because of a sprain to her right wrist and narrowing of the C6-7 neural foramen (R. 25).

At the hearing, Plaintiff described her daily activities during the relevant period of April 15, 2001 - March 31, 2003 (R. 758-765). She testified that she:

---

such an effort in 2000 (R. 121).

[2] The basis for the spelling of the VE's surname came from the transcript of the hearing before the ALJ ( R. 747 "Harry [phonetic] Cynowa") and was confirmed in the ALJ's hearing decision at R. 24.

drove her SUV several times a week;
groomed herself by bathing and brushing her hair, prepared simple meals;
rinsed the dishes prior to putting them in the dishwasher;
did some laundry including folding it but never ironing;
made the bed by pulling up the covers not changing the sheets;
vacuumed the house which had mostly hardwood floors;
dusted the home on a biweekly basis;
cleaned the sink every ten days;
balanced the check books;
paid the bills;
watched television for two and a half hours a day;
read for one hour a day;
exercised for 15-20 minutes a day by walking on the treadmill and stretching;
ate out once every three months;
visited family and friends once a month;
and spent about an hour to an hour a half per day raising exotic birds.

Plaintiff described her pain to be quite severe during the relevant period estimating that she suffered at a level ten with one being moderate pain that would be alleviated by aspirin (R. 782). And while she sought medical treatment from physicians during this time, she never went to the emergency room for the pain. Her range of mobility and motion included an ability to lift and carry approximately ten pounds, occasionally lift her arm over her right shoulder, and sit, stand or walk for a 15-20 minute duration per activity (R. 764-766). Other than smoking cigarettes, she was compliant with her treatment plan (R. 768-769).

2. _Medical Evidence Prior to April 15, 2001- March 31, 2003 Disability Period_

Plaintiff sustained neck injuries from a motor vehicle accident on November 22, 1994 (R. 359). Apparently a car made an illegal turn in front of her and she hit its rear (R. 359). There is no indication that she was hospitalized, and physical therapy records indicate treatment for her continuous pain in her cervical/dorsal area of 5-10 radiating into her right arm and fingers and left shoulder. She had an anterior fusion and cervical discectomy of C5-6 in January 1995 with followup physical therapy (R. 371). After the surgery and the physical therapy, Plaintiff continued to suffer from muscle spasms, radiating pain in the back of her

neck, numbness and tingling in her right arm prompting additional surgical procedures, one on November 6, 1995, for right thoracic outlet syndrome removing her right first rib, and another discectomy and fusion of C6-7 on August 8, 1996 (R. 540-541, 682-683).  The surgeries helped alleviate but did not eliminate her pain.  She still suffered from neck pain along with the numbness and tingling in her arm.  Additional surgeries were not an available treatment option for her, as stated by Dr. Mark G. Loomus, "She has had two neck surgeries and clearly is not interested in a third one if not absolutely necessary (which it's not)." (R. 171).

Plaintiff's back trouble did not begin with the car accident.  On February 11, 1994, Dr. B.F.  Klingelheber found there to be degenerative disc changes at L5-S1 on an examination of an x-ray taken of Plaintiff's back.(R. 664).

Therapy notes of December 23, 1994,  indicate that Plaintiff was "very pleased [with the] effectiveness of [the] TENS unit" (R. 351).[3]  On March 16, 2000, Plaintiff was examined by Dr. Judy A. Macy for symptoms of constant neck pain with pain radiating particularly down her right arm (R.121).  Her flexion and rotation were to 30°.  Dr. Macy prescribed both physical therapy to help with the pain in the cervical spine along with a pain management program combining prescription medicine Neurontin and a personal TENS  unit to be used at home (R. 121).

*3.*    *Medical Evidence During the  April 15, 2001- March 31, 2003 Disability Period*

During the relevant period of April 2001 to March 2003, Plaintiff sought treatment from Dr. Gupta reporting to him that she suffered from a painful neck and "dropping things" (R. 134).  Based on Plaintiff's reports of a high level of pain, he ordered an MRI.  The April 10,

---

[3] A Transcutaneous Electrical Nerve Stimulation (TENS) unit sends electrical impulses to block pain signals in certain parts of the body.

2002, MRI by Dr. Stephen M. Blum indicated a loss of cervical lordotic curvature centered at the C5-6 level the site of a prior spinal fusion, decreased disc signal intensity throughout the cervical and upper thoracic region compatible with dehydrational-degenerative change and postoperative spinal fusion changes at the C6-7 levels, all of which combined could be the source of Plaintiff's symptoms (R. 131-133).

**4.** ***Medical Evidence Subsequent to April 15, 2001- March 31, 2003 Disability Period***

On January 2, 2004, Plaintiff was seen by Dr. Michael Gordon at the Arthritis Care Center for a consultative examination for Dr. Woodhouse (R. 188-91). He noted her chronic neck and shoulder pain since her accident and over the last three years joint pain in her hands and elbow. She reported that Dr. Gupta told her she had rheumatoid arthritis and put her on Tylenol. She then switched to Dr. Woodhouse. Laboratory tests in August [1993 ?] showed a negative rheumatoid factor, ESR of 7, normal CBC, normal T4, and negative ANA (R. 189). Various medications for her pain caused stomach problems which resulted in the referral to Dr. Gordon. He found Plaintiff's neck supple and she was moderately limited in her range of motion (ROM) to flexion, extension lateral bending and rotation (R. 190). Her right and left shoulders were moderately irritable but with full active and passive range of motion. There was no spinal tenderness and her lumber range of motion was normal. Her neurologic exam revealed normal strength, reflexes and gait. Dr. Gordon concluded that Plaintiff failed to reveal any signs of inflammatory arthritis and he attributed her swelling – that occurred toward the end of the day and was gone in the morning – to be more likely edema than synovitis. He thought her major complaints were due more to fibromyalgia than to inflammatory arthritis (R. 191)

At a follow up visit with Dr. Gordon on March 24, 2004, her lab chemistry profile was normal except for ALT 39 (R. 181). She was noted to be a well developed individual weighing

198 in no distress. Her cervical spine had a moderately limited in ROM. He diagnosed her with fibromyalgia, cervical degenerative disc disease and lower extremity edema but no evidence of inflammatory or rheumatoid arthritis or connective tissue disease.

On April 19, 2004, Dr. J. Kaufman, a DDS physician, reviewed the medial record. He noted her history, her stiff neck and "frozen shoulder", and the findings of limited cervical ROM and normal lumbar ROM (R. 162). He noted a normal gait and balance, no neurological abnormality or signs of arthritis and he assessed her activities of daily living as normal (R. 163). There was no joint swelling, arthropathy and no deformity found (R. 169). While she had difficulty lifting and squatting she could walk a block and a half, dress, cook and shop. He did not believe the medical evidence review supported the severity of her symptoms and he found her only partly credible. He found that Plaintiff was capable of performing work lifting 50 pounds occasionally and 25 pounds frequently with no postural limitations or environmental limitations (R. 162). She could sit and stand for 6 hours each in an 8 hour day. Taking into account a review of all the evidence in the file, Dr. Kaufman assessed Plaintiff's residual functional capacity to be a medium level even while acknowledging a decreased right shoulder range of motion (R. 162).

On April 23, 2004, Plaintiff had a contrast MRI of the cervical spine. At her fusion site the MRI revealed asymmetric low signal related to uncovertabral joints suggestive of neural exit foraminal encroachment worse on the left than on the right at C6-7 fairly symmetric and C5-6. There was some bulging of disc material, canal stenosis and neural exit foraminal encroachment worse on the left at C4-5 and C2-3 and C3-4. Yet, the signal of the spinal cord was unremarkable at the cervical levels. Dr. A.L. LaValley, M.C., who did the MRI, noted that status post contrast he did not identify evidence of abnormal herniation of disc material as

indicated, and he concluded that the MRI suggested healed bone mass of C5, C6 and C7. In May 2004, Dr. Loomus found that an EMG revealed a mild, but chronic right C8 or T1 radiculopathy without ongoing denervation and minimal prolongation of the right median sensory latency consistent with post-operative Carpal Tunnel Syndrome (R.171).

In addition to her physical maladies, Plaintiff suffered from depression for which she sought treatment from January to November 1996 with Kerry C. Buhk, Ph.D., Clinical Psychologist and again in January of 2005 (R. 570, 768). To alleviate her depressive symptoms, Plaintiff reported to the psychologist that she took Zoloft, an anti-depressant, with noticeably beneficial results (R. 572). Plaintiff testified that she discontinued the medication in 1999 (R. 786). A psychiatrist from DDS, K. Sheth, M.D., concluded that there was no medically determinable psychiatric impairment during the relevant period (R. 144-157).

5. ***Medical Evidence Submitted After the February 9, 2006, decision by the ALJ*** [4]

Plaintiff submitted a largely illegible medical assessment form on her ability to do work-related activities from Walter Woodhouse, M.D., dated June 6, 2006 (R. 700-1). Dr. Woodhouse apparently had treated Plaintiff in an earlier time period including 2003 when Dr. Gordon noted Plaintiff switched from Dr. Gupta. Yet, this supplemental medical report of Dr. Woodhouse does not note on the form the time period to which he refers. Dr. Woodhouse indicates that Plaintiff suffered from chronic fatigue syndrome, fibromyalgia, arthritis of the neck, shoulder and elbow, pedal edema, right thorasic outlet syndrome, carpel tunnel syndrome, cervical radiculopathy, neuropathy (R. 700). Dr. Woodhouse found that the

---

[4] While this submission cannot be considered for purposes of determining the substantiality to uphold the Commissioner's decision in this review, it can be considered to determine whether it is sufficient to warrant a remand under 42 U.S.C. § 405(g). *Cotton v. Sullivan*, 2 F.3d 692 (6th Cir. 1993).

Plaintiff suffered from the following limitations: a carrying weight restriction of 2-3 pounds; a standing or walking duration of no more than two hours in a an eight-hour work day; a limit of two and half hours of sitting during an eight-hour work day; no crouching, kneeling or crawling; and environmental restrictions regarding moving machinery, noise and vibration.

### 3. *Vocational Evidence*

VE Cynowa testified that Plaintiff's past work as an accounting clerk was a skilled position and required a medium level of exertion to perform (R. 772). The ALJ asked VE Cynowa whether an individual of Plaintiff's age, education, work experience and right-hand dominant could perform the past relevant work if that individual was limited to lifting no more than 50 pounds occasionally, 25 pounds frequently, involving primarily seated work and all other limitations discussed by the Dr. Kaufman (R.773-774). VE Cynowa affirmed that such a hypothetical person could perform the past relevant work Plaintiff performed (R.774). ALJ Haubner asked if there existed alternative work for such a hypothetical person in the national and regional economy. VE Cynowa noted an additional 12,000 such jobs were available in southeast Michigan. The ALJ continued by asking several permutations on this hypothetical question assuming various limitations. VE Cynowa responded that with each of those limitations the worker could manage a substantial numbers of jobs in the national and regional economy (R.773-779). VE Cynowa felt Plaintiff could not perform any jobs if Plaintiff's testimony were fully credited or the restrictions of her treating physician, Dr. Kurt M. Roecker D.O., were adopted (R.777-8 and 327-8). These included carrying restriction of less than five pounds, needing a break from sitting after only one to two hours, and an inability to climb, balance, stoop, crouch, kneel or crawl.

**4.** _ALJ Haubner's Decision_

ALJ Haubner found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2003, and that she had not engaged in substantial gainful activity since her alleged onset date of April 15, 2001 (R. 25). He found that Plaintiff's status post motor vehicle accident in 1994, two cervical surgeries and fusion at C5-7 and history of right frozen shoulder were a "severe" impairment within the meaning of the Regulations, but not "severe" enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, or Regulations No. 4 (R. 25). He found the more recently reported depression to have first appeared in the medical evidence was "well past" the date she was last insured (R.25).[5] He noted some psychiatric treatment in 1996 but no psychiatric medication since 1999, well before her April 2001 onset date (R.26). He also noted she had worked after 1999.

ALJ Haubner disregarded the VE's testimony regarding the Plaintiff's inabilities to perform her past relevant work because it was given in response to hypothetical facts adopting limitations documented after the last date of her insured status (R.25). For periods prior to March 31, 2003, ALJ Haubner found that Plaintiff retained the RFC for a limited range of light work with occasional reaching above the shoulder level with the right arm. He concluded that Plaintiff could return to her past relevant work as an accounting clerk or in the alternative Plaintiff had the ability to make a vocational adjustment to unskilled light work for which a significant number of jobs existed. (R. 27 & 29).

ALJ Haubner afforded little weight to what he characterized as a "fill-in-the-blanks, check-blocks" report by Dr. Roecker  that concluded  Plaintiff's limitations prevented her from

_____

[5] A February 27, 2004, DDS Consultation form noted that Plaintiff "stated that she has no current problems with depression" (R. 158.).

substantial gainful activity. This report was prepared shortly before the December 2005 hearing. It appears that Dr. Roecker began seeing Plaintiff in September 2004 (R. 224-25). ALJ Haubner could not determine whether Dr. Roecker's opinion was based on Plaintiff's subjective complaints or on objective findings and observations by Dr. Roecker nor how often he saw her (R.27). He also did not know if the onset of problems in Dr. Roecker's report was during the time Plaintiff was still insured for OASDI. ALJ Haubner requested that Plaintiff's counsel obtain further clarification of these conclusions and he held the record open for this. He only received clarification on Dr. Roecker's board certification, but nothing further. Given the doctor's timidity to respond in writing, Plaintiff's attorney wrote asking if subpoenaing the doctor was appropriate (R.27). ALJ Haubner used this reluctance of Dr. Roecker, coupled with the lack of details and explanation for his conclusions, to discount the weight given to this report. While Plaintiff's counsel correctly notes that medical evidence submitted for time periods after the last date of insured status can be relevant and relate back to the prior period, particularly for chronic, slowly evolving impairments,[6] ALJ Haubner discounted this report for reasons in addition to its lack of specificity on time. He noted concerns over its lack of clarity on whether it was based largely on the subjective history as given by Plaintiff or on medical data or clinical observations and findings of Dr. Roecker.

The ALJ found that Plaintiff's allegations regarding her limitations were not totally credible. It is this portion of the ALJ's opinion that forms the core of Plaintiff's complaint in this case. ALJ Haubner found that Plaintiff had a poor, sporadic work history with only five of the past fifteen relevant years spent in full substantial gainful activity (R.27). He also found

---

[6] *See Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir.1984) and *Ellis v. Schweiker,* 739 F.2d 245 (6th Cir., 1984).Once a condition is shown to exist it may be presumed to have continued. *Richardson v. Heckler,* 750 F.2d 506, 510 (6th Cir.1984).

that she was able to perform a wide range of daily living activities during the relevant period. These activity included driving an SUV three to four times a week, managing her personal grooming, cooking, doing the dishes twice a day and laundry twice a week, vacuuming and dusting and mental tasks of managing the checking account, paying bills and reading for one hour per day (R. 27-8). She was able to exercise for 15-20 minutes on a daily basis working out on the treadmill and light stretching. He found also that she was able to pursue her hobby of raising exotic birds spending one and half hours per day caring for them plus an additional two hours a week with the birds for enjoyment. Further, the ALJ found her estimation of pain level exaggerated in that she indicated that she was at a level ten for neck and shoulder pain, with a ten rating requiring emergency room treatment for pain, though she never went to the emergency room once during the relevant period (R. 28). And finally, the ALJ found that the Plaintiff was not fully compliant with the treatment plan because she continued to smoke cigarettes against medical advice and drank alcohol on occasion after denying that she ever drank (R. 28).

**II.**     **Analysis**

**A.**     **Standards of Review**

Plaintiff must establish that she became disabled under Title II of the Act prior to March 31, 2003, the date her insured status expired. *See* 42 U.S.C. § 416(I); 20 C.F.R. §§ 404.131(a), 404.320(b)(2)*; Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment(s) must be of such severity that the

individual can neither do her previous work nor engage in any other kind of substantial gainful work which exists in the national economy, considering her age, education, and work experience. *See id.* § 423(d)(2)(A).

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. *Id.* If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm. *Studaway v. Secretary of HHS*, 815 F.2d 1074, 1076 (6th Cir. 1987); *Kirk v. Secretary of HHS*, 667 F.2d 524, 535 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). In determining the existence of substantial evidence, it is not the function of a federal court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry the burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her

past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects. A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform. *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

### B.   Factual Analysis: Plaintiff's Credibility at Issue

Plaintiff challenges the Commissioner's decision arguing that the ALJ's credibility finding is not supported by the record because it failed to adequately assess Plaintiff's subjective estimation of her pain. Subjective evidence is only considered to "the extent [it] can reasonably be accepted as consistent with the objective medical evidence and other evidence" (20 C.F.R. 404.1529(a)) (*See Young v. Secretary of Health & Human Servs.,* 925 F.2d 146, 150-51 (6th Cir. 1990); *Duncan v. Secretary,* 801 F.2d 847, 852 (6th Cir. 1986) (Subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record that would explain such pain). The issue of a claimant's credibility regarding subjective complaints is largely within the scope of

the ALJ's fact finding discretion – the Commissioner's "zone of choice" – if adequately explained and supported by the record.

The ALJ is not required to accept a claimant's own testimony regarding allegations of disabling pain when such testimony is not supported by the record. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The ALJ must, however, do more than say the testimony is not credible based on generalities or merely recount the medical evidence and claimant's daily activities and then without analysis summarily conclude that the overall evidence does not contain the requisite clinical, diagnostic or laboratory findings to substantiate the claimant's testimony regarding pain. *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994). In order for an ALJ to properly discredit a claimant's subjective testimony, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons. S.S.R. 96-7p directs that findings on credibility cannot be general and conclusory findings, but rather they must be specific.

ALJ Haubner found that the medical record, including hearing testimony, did not support Plaintiff's claims of a RFC precluding any work. ALJ Haubner found that Plaintiff is status post motor vehicle accident, post two cervical surgeries and fusion and history of frozen right shoulder. And while these conditions are severe within the meaning of the Regulations, they neither singularly or in combination are severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, regulations No. 4. Plaintiff does not challenge this finding. ALJ Haubner  assessed Plaintiff's residual functional capacity ("RFC") and found that on or before the last insured date, she had the RFC for light  work with occasional reaching above the shoulder level with her right arm and was thus capable of

performing her past relevant work as an accounting clerk and a restricted range of other light work identified by the vocational expert.

It is this conclusion regarding her RFC which Plaintiff contends is not based on substantial evidence because ALJ Haubner failed to properly assess her pain, compliance with the treatment plan and work history. She argues specifically that objective medical evidence exists to confirm her subjective reports of pain. Counsel acknowledges that there is a gap in the medical records in this case apparently because records from May 1999 to 2003 were lost in the course of treating physician , Dr. Walter Woodhouse,  moving his medical practice (R. 703-704).   During the relevant period of April 2001 to March 2003,  Dr. Gupta noted significant  neck pain  and Plaintiff's "dropping things" (R. 134), but he did not complete a RFC form.

Thus, there are no opinions from a treating physician in the record as to her RFC before the date last insured, although Dr.  Woodhouse's June 2006 report submitted to the Appeals Council may refer to that period.  The April 2004 medical opinion from DDS physician J. Kaufman assesses her RFC, based on the medial recorded.  That is dated thirteen months after her date last insured, yet it is based on a review of the medical evidence available at that time. As noted above, Dr. Kaufman did not believe the medical evidence he reviewed supported the severity of Plaintiff's symptoms and he found her only partly credible.  Dr. Kaufman found that Plaintiff was capable of performing medium work lifting 50 pounds occasionally and 25 pounds frequently with no postural limitations or environmental limitations although he acknowledged a decreased right shoulder range of motion as well as her cervical limitations (R. 162). Dr. Kaufman was an adjudicator at the state agency level, but his report is treated as opinion evidence at the administrative hearing stage. S.S.R. 96-5p and 20 C.F.R.404.1527(f).  ALJ

Haubner, who had the advantage of seeing Plaintiff at the hearing, gave somewhat greater weight to the Plaintiff's complaints regarding her limitations and found that Plaintiff could only perform a limited range of light work, with occasional reaching above shoulder level with her right arm. It was a hypothetical question using these limitations to which the VE responded that Plaintiff could perform her past relevant work and various light jobs. The ALJ adopted this vocational testimony in his decision.

There was evidence submitted by a treating physician, Dr. Roecker, dated December 13, 2005, regarding Plaintiff's limitations that could prevent her from achieving substantial gainful activity. This report, however, was in many parts illegible, failed to specify if it applied to the April 15, 2001- March 31, 2003, period, and it failed to account for the bases for the conclusions. ALJ Haubner requested clarification on these matters and did not receive a satisfactory response. The Plaintiff's attorney inquired of the ALJ if subpoenaing the doctor was appropriate but neither never took the initiative to subpoena the doctor. As a result, ALJ Haubner afforded little to no weight to Dr. Roecker's opinion. S.S.R. 96-5p notes that when the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the ALJ "cannot ascertain the basis of he opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion." Given the reluctance of Dr. Roecker to provide further information it might have been appropriate for the ALJ to have subpoenaed Dr. Roecker's records or submitted targeted questions to him. Yet, no further action seems appropriate at this point.

Plaintiff's counsel has not raised this issue and pressing a reluctant source is commonly of little benefit. [7]

Plaintiff's pain argument relies, to a large degree, on an evaluation that her diagnoses "could reasonably be expect to cause" her symptoms and functional limitations (Dkt #9, p. 7-8). As in nearly all cases reaching this court, there is no objective medical evidence supporting Plaintiff's claims of pain, nor is it required.[8] 20 C.F.R. § 404.1529(a) makes it clear that "statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain symptoms alleged." Here the medical evidence is such that reasonable persons could differ on whether Plaintiff's subjective claims are credible. While there are medical reports showing a significant cervical problem, there is also evidence that Plaintiff could manage her personal care needs and is capable of doing several activities on a daily basis.

The record suggests Plaintiff's most significant problems followed her November 1994 car accident and her January and November 1995 and her August 1996 surgeries and attendant physical therapy. While her work record shows a decrease in earnings from $6.969.50 in 1994 to $5.233.76 in 1995, her earnings increased to $8,180.29 in 1996 and were $7,055.10 in 1997 (R. 56-57). 1998-2001 show a significant reduction in earnings with no earnings thereafter (R.

---

[7] *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 149 (6th Cir. 1990) (issues not raised in district court are waived.).

[8] Neither the statute nor the regulations require a claimant to prove his degree of pain and limitations by objective medical evidence. *See, e.g.*, 20 C.F.R. § 404.1529(c)(2) and *Duncan v. Secretary of HHS*, 801 F.2d 847, 853 (6th Cir. 1996).Yet, 20 C.F.R. § 404.1529(a) makes it clear that"statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain symptoms alleged."

56-57). While Plaintiff claims disability from April 15, 2001, and Plaintiff's condition is chronic and progressive, there are no significant medical events or findings in this critical period suggesting why Plaintiff's condition deteriorated substantially in 1998 and following. While missing medical records from Dr. Woodhouse may explain some of this, Plaintiff does not indicate any traumatic events, hospitalizations or emergency room visits, or any new tests and findings other than those reflected in the record.

Plaintiff posits the additional argument that ALJ Haubner failed to account for her medications and their side effects during the period of disability. The only medication during the relevant period was a prescription from Dr. Gupta for Darvocet, a pain medication (R. 134). The other medications to which Plaintiff refers were all prescribed after the relevant period (R. 84,103,129 and 300). Plaintiff testified that the medications she took made her drowsy and her "mind would wander" about an hour after taking Darvocet (R. 765-67). While ALJ Haubner would have been prudent to discuss Plaintiff's medication and made findings on their side effects his failure to do so does not warrant judicial intervention in a case such as this where there is no evidence in the medical records that Plaintiff complained to any of her treaters about the side affects of any medication during the relevant time period.

Additional to the pain argument, Plaintiff contends that ALJ Haubner 's credibility determination of Plaintiff's work history was not based on substantial evidence. ALJ Haubner found that her work history showed only five years of full substantial gainful activity of the past relevant 15 (R. 27 and 60). Plaintiff argues that ALJ Haubner failed to account for the decreased work level after the motor vehicle accident in 1994. Yet, as noted above, a review of the record shows a dip in earnings in the year following the accident, there were significantly higher earnings in both 1996 and 1997 before the sharp drop off (R. 56-57 & 60). Thus, a

reasonable fact finder could assume that Plaintiff maintained a capacity for substantial work following her accident and whether the significant decrease thereafter was caused by her medical condition or by choice is an open question on which the record is not so clear that this Court should decide it as a matter of law.  There were no significant events or medical findings that would make obvious that in 1999 and following Plaintiff's capacity for work was substantially lower than in 1996 and 1997 when she had her highest earnings.  When the record does not demonstrate some obvious error in ALJ Haubner 's accounting of her work history this Court should defer to the judgment and findings of the administrative decision maker.

ALJ Haubner  also relied on his observations of the Plaintiff during her testimony to assess her credibility.  It is the ALJ's duty to observe witness's demeanor and credibility and use these observations in evaluating credibility.  SSR 96-7p; *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997).  ALJ Haubner noted that the Plaintiff appeared somewhat unresponsive.  He wrote that her testimony that she never consumed alcohol was inconsistent with the record citing that she occasionally drank (R. 178).  He also found her assessment of her pain level to be exaggerated.  She testified that the pain she endured was at a ten, the maximum on a scale of one to ten during the relevant period, yet she could not recall ever having gone to the emergency room for pain.  While the work record like the minor disparity regarding drinking are not particularly strong evidence regarding credibility, the pain statement of 10 – with this being the maximum level of pain warranting immediate treatment, where no such hospital or comparable treatment is noted in the record –  is a form of testimony that reasonably could be interpreted as an exaggeration.

This is a case where the evidence on subjective symptoms is such that reasonable minds could differ in the evaluation.  Apparently certain of Plaintiff's treating  physicians fully

credited it in determining Plaintiff's limitations. The state agency medical consultant evaluating the medical record felt the medical evidence review did not support the degree of asserted limitations Plaintiff asserted. It is not the function of this Court on such a record to determine as a matter of law that the ALJ should have fully credited Plaintiff's subjective claims and not, like Dr. Kaufman, believed there was some enhancement by Plaintiff of her claimed limitations. In determining the existence of substantial evidence, it is not the function of a federal court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). While the evidence could be read to support Plaintiff's claims, it is clearly equivocal enough that a reasonable person could discount Plaintiff's claims. Considering the record as a whole, this case falls within the Commissioner's zone of choice where Courts should defer to the administrative decision maker because there is substantial evidence to uphold that finding.

### III. Request for Remand

Plaintiff argues that while there are no medical records from Dr. Woodhouse for the period of May 1999 to 2003 due to their being lost during an office move, she believes the June 6, 2006, report might have changed the outcome of the ALJ's decision (R. 700-1). The report first came into evidence after the ALJ's decision and was provided to the Appeals Council for review. Based on this new evidence, Plaintiff requests a remand to consider Dr. Woodhouse's 2006 report. Because this evidence was not before the ALJ when he rendered the final decision of the Commissioner, it cannot be considered for substantial evidence review. *See Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 685 (6th Cir. 1992). The only purpose for which this Court can consider this additional evidence is to determine whether this case

should be remanded to the agency pursuant to the sixth sentence of 42 U.S.C. § 405(g). *Cotton v. Secretary of Health and Human Services*, 2 F.3d 692, 695-96 (6th Cir. 1993).  This court may remand the case if the additional evidence is new and material, and if there was good cause for failure to incorporate the additional evidence into the record at a prior hearing. 42 U.S.C. § 405(g) (sentence six); *See Wyatt*, 974 F.2d at 685; *Casey v Secretary of Health and Human Services*, 987 F.2d 1130, 1233 (6th Cir. 1993).

It is not clear that this evidence meets the standards warranting a remand. Like  Dr. Roecker's report, Dr. Woodhouse's submission does not indicate that it is applicable to Plaintiff's condition during the April 2001 to March 31, 2003, time period under review in this case.  Thus it is not clear it is material.  The failure to incorporate the evidence into the record at the February 2006 hearing obviously could not have happened because it simply did not exist at that time. Yet, if Dr. Woodhouse was Plaintiff's treating physician from 1999 and into the relevant 2001-2003 time frame, there is no showing why this evaluation was not obtained prior to the hearing on this case or an extension sought for this purpose.  This circuit, like most courts, requires a stricter showing of why the additional evidence was not or could not have been presented at the earlier ALJ hearing.  *See, e.g.*, *Oliver  v. Secretary*, 804 F.2d 964, 966 (6th Cir. 1986); *Willis v. Secretary*, 727 F.2d 551, 553-4 (6th Cir. 1984); *Dorsey v. Heckler*, 702 F.2d 597, 604 (5th Cir. 1983); *Ward v. Schweiker*, 686 F.2d 762, 764 (9th Cir. 1982) (citing *Carter v. Schweiker*, 649 F.2d 937, 942 (2d Cir. 1981)).  For these reasons, Plaintiff's request for a remand under sentence six of § 405(g) should be denied.

**IV.**      **RECOMMENDATION**

For the reasons stated above, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment and alternate request for a remand be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local, 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: February 26, 2008                 s/ Steven D. Pepe
Ann Arbor, MI                        United States Magistrate Judge

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing ***Report and Recommendation*** was served on the attorneys and/or parties of record by electronic means or U.S. Mail on February 26, 2008.

<u>s/ Alissa Greer</u>
Case Manager to Magistrate
Judge Steven D. Pepe
(734) 741-2298
